# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| ELISA ANNE H.,        ) | |
|              ) | |
|     Plaintiff,      ) | |
|              ) | |
|        v.        ) | Case No. 1:22-cv-1328 |
|              ) | |
| KILOLO KIJAKAZI, Acting   ) | |
| Commissioner of Social Security,  ) | |
|              ) | |
|     Defendant.     ) | |

## ORDER & OPINION

This matter is before the Court on motion of Plaintiff Elisa Anne H. ("Plaintiff") to reverse or remand the final decision of the Social Security Commissioner ("Commissioner") to deny her disability insurance benefits. (Doc. 12). Defendant Commissioner provided a Brief in opposition (doc. 17), seeking to uphold the decision to deny benefits, and Plaintiff replied (doc. 18). The matter is therefore ripe for review. For the following reasons, the Court affirms the decision of the Administrative Law Judge ("ALJ").

### PROCEDURAL BACKGROUND

Plaintiff Elisa Anne H. filed a Title II application for disability insurance benefits in March 2018, initially alleging an onset date of February 9, 2016, but later amending the date to January 1, 2018. (R. at 330, 1587).[1] The Social Security Administration denied Plaintiff's application initially on August 20, 2018, and again

---

[1] Citation to "R. at __" refers to the page in the certified transcript of the record of proceedings provided by the Social Security Administration.

on reconsideration on October 17, 2018. (R. at 238, 257). Plaintiff requested a hearing before an ALJ, which took place on February 14, 2019. (R. at 172–222). On May 16, 2019, the ALJ issued a decision concluding Plaintiff was not disabled and therefore was ineligible for disability benefits. (R. at 51–74). The Social Security Administration Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision final. (R. at 1–7). Plaintiff appealed her case to this Court, which remanded the matter to the Commissioner for further administrative proceedings. (R. at 1703). The ALJ, on remand, was instructed to "evaluate the medical evidence, including medical source opinion evidence; evaluate Plaintiff's subjective symptoms; evaluate Plaintiff's residual functional capacity; if necessary, obtain medical expert evidence; if necessary, obtain supplemental vocational expert testimony; and issue a new decision." (R. at 1703).

On July 8, 2020, Plaintiff filed a subsequent claim for disability insurance benefits and received a favorable determination, finding her disabled as of May 17, 2020. (R. at 1587, 1706). The question of whether Plaintiff was disabled during the time between January 1, 2018, to May 16, 2020, remained. (R. at 1706). After a hearing on December 8, 2021, the ALJ again concluded Plaintiff was not disabled and was not eligible for disability benefits during the time period. (R. at 1594–633). The Appeals Council denied Plaintiff's request for review, rendering the ALJ's second decision final. (R. at 1581–86). Plaintiff thereafter filed the instant Complaint on September 23, 2022. (Doc. 1).

FACTUAL AND MEDICAL BACKGROUND

The following is a summary of Plaintiff's medical records submitted to the ALJ for consideration.

Prior to Plaintiff's alleged disability onset date of January 1, 2018, she worked in social services as a case manager and most recently as an insurance agent. (R. at 14). She has a college degree; she graduated from Purdue University with a 3.68 GPA. (R. at 14). As an insurance agent, Plaintiff mostly sold health and life insurance plans. (R. at 1640). During the time period at issue, Plaintiff reported working only ten hours per week, often spread out in shorter intervals across a few days due to her mental and physical difficulties. (R. at 1645). She stopped working as an insurance agent on May 16, 2020, and has not held gainful employment since. (R. at 1645).

Plaintiff's alleged mental difficulties relate back to her experiences in childhood and early adulthood. (R. at 13, 656, 1391). Her medical records reveal troubling details about her upbringing and prior relationships. Namely, Plaintiff reported her first reported experiences with self-injurious behavior began at age four due to verbally abusive parenting. (R. at 13). Her history of trauma is significant; Plaintiff reports numerous instances of sexual assault by her previous partner and others. (R. at 14, 656). Despite her background, Plaintiff states that her mental difficulties did not interfere with her ability to hold gainful employment until her miscarriage in 2016. (Doc. 12 at 3). On February 9, 2016, Plaintiff suffered the loss of her son at 17 weeks gestation. (R. at 15). Out of concern for her safety, Plaintiff was voluntarily admitted to the hospital after reporting self-injurious behavior and

suicidal statements. (R. at 653). She was treated from March 3, 2016, to March 7, 2016. (R. at 653). Her medical records demonstrate that Plaintiff thought "[she] killed her baby" due to her diabetes, experienced "great guilt, sadness, and distress," and began "punching herself . . . and stabbed herself . . . several times with her insulin needle." (R. at 653). While admitted, Plaintiff reported using self-injurious behaviors as a coping mechanism for guilt and wrote the fetus's name across her arm. (R. at 650).

Relevant to this matter, Plaintiff has diagnoses for latent autoimmune diabetes in adults (managed as Type I diabetes), interstitial cystitis, and obesity. (R. at 1066, 1068). Related to Plaintiff's mental health symptoms, she has been diagnosed with major depressive disorder, generalized anxiety disorder, attention deficit disorder, and post-traumatic stress disorder ("PTSD"). (R. at 1160–62, 1368). From January 1, 2018, to May 16, 2020, Plaintiff saw numerous medical providers, including and of note Dr. Syed Amanullah for psychiatric care, Advanced Practice Nurse ("APN") Gregory Garmon for endocrine care, Dr. Jessica White for primary care, and Licensed Clinical Social Worker and pastor Mr. John Nordstrom for counseling services. (Doc. 12 at 3).

Plaintiff has been in the care of Dr. Amanullah since 2016. In February 2018, Plaintiff had an appointment with Dr. Amanullah, who recorded Plaintiff as being cooperative, pleasant, and having good eye contact. (R. at 1368). She had good judgment and insight, no psychotic thought content, and her thoughts were linear and goal-directed. (R. at 1368). Dr. Amanullah managed Plaintiff's medications and

saw her again the following month for routine medication management. (R. at 1366). Before Plaintiff's appointment in April 2018, Dr. Amanullah received a fax from Plaintiff that she had engaged in self-harm. (R. at 1556). Dr. Amanullah adjusted her medications and Plaintiff reported they helped with her symptoms. (R. at 1364, 1556). In May 2018, Dr. Amanullah adjusted her medications again based on her reports of decreased energy. (R. at 1365).

In July 2018, Dr. Amanullah recorded improvement based on the medication changes. (R. at 1503). Plaintiff was reported to have linear, goal-directed thoughts with good insight and judgment. (R. at 1503). While Plaintiff reported thoughts of suicide, she denied having intent or a plan. (R. at 1503). In September 2018, Plaintiff reported that she changed her medication due to heart-rate issues. (R. at 1501–02). Dr. Amanullah reviewed her current medications and documented that Plaintiff presented with no psychomotor abnormalities or psychotic thought content and with linear and goal-directed thoughts. (R. at 1501–02). In November 2018, Dr. Amanullah did not indicate any changes to Plaintiff's treatment; however, Plaintiff reported feelings of frustration and depression, including thoughts of suicide. (R. at 1556). Dr. Amanullah recorded mostly normal examination findings, but with depressed mood and poor insight, as well as continuing thoughts that Plaintiff caused her miscarriage. (R. at 1556).

In January 2019, Dr. Amanullah recorded medication changes that helped with Plaintiff's sleep, and that Plaintiff was starting a different form of therapy soon. (R. at 1570). She had not engaged in self-harm but reported negative self-perception.

(R. at 1579). The next month, Dr. Amanullah recorded that the new therapy was unsuccessful. (R. at 1579). However, Plaintiff did not engage in self-harm and reported improved sleeping. (R. at 1579). Dr. Amanullah modified Plaintiff's diagnosis of major depressive disorder to include "recurrent severe without psychotic features." (R. at 1580). Plaintiff continued to perseverate on the loss of her child and have poor insight; otherwise, Dr. Amanullah recorded normal examination findings. (R. at 1580). When Plaintiff presented in March 2019, Dr. Amanullah did not modify her treatment plan but documented a continued struggle with poor self-image. (R. at 2015).

In May 2019, Dr. Amanullah recorded Plaintiff's recent weight loss, but also her reported difficulty with social situations, anxiety, and desire to self-harm. (R. at 1993). Her next appointments demonstrate the same concerns; however, Plaintiff expressed to Dr. Amanullah that she wanted "off her meds." (R. at 1967). By January 2020, Plaintiff was not taking psychiatric medications. (R. at 2280). She discussed pregnancy options while reporting energy concerns, sleep issues, and poor self-esteem. (R. at 2280). Plaintiff's last appointment with Dr. Amanullah in the relevant time period was in March 2020, when she discussed her pandemic-related concerns. (R. at 2261).

Plaintiff saw APN Garmon for endocrine care. At her May 2018 appointment, Plaintiff and APN Garmon discussed her weight gain and pump therapy for her diabetes care. (R. at 1343). Plaintiff told APN Garmon that she wanted to research the new pump, and APN Garmon recorded that Plaintiff had not been "paying very

much attention to her [ ] data which has attributed to her worsening in control." (R. at 1346). Otherwise, APN Garmon recorded normal examination findings, and that Plaintiff presented as active, in no apparent distress, and oriented with normal affect. (R. at 1345). In October 2018, Plaintiff's appointment with APN Garmon revealed that she had worsening "glucose control" secondary to "increased carbohydrate intake, high stress, and less than ideal" care with her new pump and sensor. (R. at 1545). APN Garmon also documented Plaintiff was not properly administering her insulin in advance of her meals. (R. at 1539). Plaintiff reported technology difficulties with the sensors on the new pump, and APN Garmon recommended solutions and encouraged Plaintiff to continue with the new technology. (R. at 1545).

In January 2019, APN Garmon documented improved control and stability of Plaintiff's diabetes symptoms. (R. at 2061). After reviewing Plaintiff's current medications and treatment plan, he made recommendations to Plaintiff about how to further control and prevent episodes of high blood sugar. (R. at 2061). In June 2019, APN Garmon recorded Plaintiff's struggle to follow his recommendations to prevent high blood sugar and discussed weight-loss medications. (R. at 2072). At Plaintiff's next appointment, APN Garmon did not report significant changes, and he recommended that Plaintiff continue her efforts with therapy, diet, and regular exercise. (R. at 2083). In January 2020, APN Garmon noted that Plaintiff's overall control of her diabetes was stable enough for pregnancy at that time, as Plaintiff expressed interest in attempting to conceive. (R. at 2095).

Plaintiff saw her primary-care physician, Dr. White, during the relevant time period.[2] The primary-care physician's office recorded ear pain and jelly-fish stings when Plaintiff returned from a vacation in January 2018. (R. at 1055). She presented as oriented, alert, active, and in no distress. (R. at 1057). In June 2018, in a follow-up appointment with Dr. White, Plaintiff complained of neck pain and difficulty losing weight. (R. at 1436–37). The examination findings were normal, and Plaintiff presented as alert and oriented with normal mood and affect. (R. at 1438). In August 2018, Plaintiff experienced chest pains and high blood sugar, which caused her to visit the emergency room. (R. at 1434–35). She stayed overnight for monitoring and blood sugar management. (R. at 1434–35). Upon discharge, she was given a wearable device, a Holter monitor, to gather data on her heart rhythm. (R. at 1452). Plaintiff's cardiologist later reviewed the results of the monitor and found them to be consistent with tachycardia. (R. at 1452). After the emergency-room visit, Plaintiff was instructed to follow up with Dr. White and her other medical providers, if needed. (R. at 1435).

For counseling services, Plaintiff saw Mr. Nordstrom, who also accompanied her to a challenging medical appointment.[3] In August 2018, Plaintiff wrote her obstetrician-gynecologist, Dr. Michael Leonardi, a letter describing her thought process regarding what caused her miscarriage. (R. at 513–15). She interpreted statements made by Dr. Leonardi as blaming her for the death of the fetus. (R. at

---

[2] Plaintiff's medical records only document her visits to Dr. White through the end of 2018.

[3] Plaintiff's medical records do not include treatment notes or other documentation from her counseling with Mr. Nordstrom; thus, this summary does not include her history with the counselor.

513). The letter included questions on what happened, such as "[w]as it that my body somehow failed him . . . [m]y body somehow committed feticide unbeknownst to my mind[,]" and "[w]as it that my diabetes . . . [k]illed my child . . . [w]as I a murder[er] to my unborn son?" (R. at 514). Plaintiff similarly wondered what the "punishment" should be, writing "[r]adical [h]ysterectomy? I don't know." (R. at 514). As a follow up to the letter, Plaintiff, her husband, and Mr. Nordstrom attended an appointment with Dr. Leonardi to discuss her miscarriage and whether her diabetes affected her pregnancy. (R. at 1498–99). When discussing how Plaintiff was not responsible for the loss of her son, Plaintiff slapped herself twice and stated, "I was doing everything right and my baby still died[.]" (R. at 1499). Both Dr. Leonardi and Mr. Nordstrom expressed concern over Plaintiff's actions. (R. at 1499).

Plaintiff saw her cardiologist, Dr. Amit Mehrotra, for reported irregular heartbeat and sinus tachycardia in 2018 and 2019. After Plaintiff's visit to the emergency room, she attended a follow-up cardiology appointment at which she presented with regular heart rate and rhythm, and further testing revealed normal findings. (R. at 1422–25). Her medication was managed. (R. at 1423). In December 2018, Dr. Mehrotra modified Plaintiff's medications to help alleviate her cardiovascular symptoms. (R. at 1561). In June and August of 2019, Plaintiff visited Dr. Mehrota, who documented general improvements with her symptoms and normal examination findings. (R. at 1940, 1943, 1947).

Plaintiff saw Dr. Kimberley Gelbort for therapy on a regular basis from March 2019 until April 2020. At her initial psychological evaluation, Plaintiff discussed her

history of depression, self-injurious behaviors, and limited social interaction with pregnant women. (R. at 2021–26). Dr. Gelbort reviewed Plaintiff's medications and medical history; Plaintiff informed her that she engages in self-injurious behaviors as often as once per week. (R. at 2022). Dr. Gelbort's examination revealed occasional suicidal thoughts and compulsions; Plaintiff was found to be of low risk to harm herself or others. (R. at 2025). Of note, Dr. Gelbort diagnosed Plaintiff with dissociation and noted her diagnoses of major depressive disorder, generalized anxiety disorder, and complex PTSD. (R. at 2026). Dr. Gelbort's treatment notes from the end of the year and into 2020 chronicle Plaintiff's work activities, daily activities with her family, and both increased and decreased mental health symptoms. (R. at 1958, 1961, 1964, 1969, 1973, 1975, 1978, 1981, 1984, 1986, 1988, 1991, 1999, 2002, 2005, 2007, 2009, 2011).

In September 2019, Plaintiff completed a psychological assessment with Dr. Karen Smith at the request of her attorney. (R. at 2041–51). The examination concluded that of concern, Plaintiff suffered from "extreme depression," continued suicidal ideation, and lack of interest in activities. (R. at 2051). Dr. Smith then provided a medical opinion, stating that Plaintiff's ability to work and form relationships was extremely impaired by her inability to trust and her avoidance of certain people and places. (R. at 2051). Dr. Smith opined that Plaintiff could not perform any work. (R. at 2051).

## I.   State Agency Consultants

On July 17, 2018, state agency consultant Dr. Mark Langgut examined Plaintiff. (R. at 1392). Plaintiff recounted her background, including her history of

depression. (R. at 1393). She reported episodes of "losing time," and that she ended communication with her friends because "they have all had babies." (R. at 1393). Dr. Langgut's examinations showed Plaintiff was coherent, cooperative, polite, and had generally logical thoughts, fair eye contact, normal speech, and intact short-term and long-term memory functioning. (R. at 1394). He noted that her basic computational skills and overall skill level were consistent with her presentation and education. (R. at 1394). Plaintiff was noted for having some delusional beliefs that could affect her ability to act reasonably, along with mildly obsessive ideas; she denied having any delusions, phobias, or hallucinations. (R. at 1394). Dr. Langgut considered diagnoses of major depressive disorder and generalized anxiety disorder related to PTSD symptoms, and he concluded Plaintiff has adequate abilities that allow her to function independently. (R. at 1395). He did not opine on Plaintiff's work-related limitations.

On July 20, 2018, Plaintiff was examined by Dr. Fatimah Oloriebge. (R. at 1397). Plaintiff provided background to Dr. Oloriebge on her diabetes, depression, and PTSD symptoms. (R. at 1397–98). Dr. Oloriebge completed a full physical examination, recording Plaintiff as presenting as alert, oriented, appropriate, pleasant, and cooperative. (R. at 1398–400). All examination findings, other than a decreased range of motion due to obesity, were recorded as normal. (R. at 1398–400). Dr. Oloriebge indicated a history with diabetes, PTSD, depression, fatigue, possible narcolepsy, interstitial cystitis, and low back pain in her findings. (R. at 1400). She did not opine on Plaintiff's work-related limitations.

11

Non-examining state agency psychological consultant, Dr. Joseph Mehr, opined Plaintiff could perform simple, routine, and repetitive tasks with simple decision making, e.g., unskilled work. (R. at 234). He considered Plaintiff's complete mental health history, including her PTSD, anxiety, depressed mood, compulsions, irritability, and distrust of others, and opined that her interactions should be limited to occasional contact with only supervisors and coworkers. (R. at 234). These findings were affirmed by Dr. Leslie Fyans upon reconsideration. (R. at 253). Additional non-examining state agency medical consultants, Dr. Richard Lee and Dr. Calixto Aquino, gave opinions on August 13, 2018, at the reconsideration level. (R. at 231–32, 250–51). They similarly opined Plaintiff could perform a full range of light exertional work with some limitations. (R. at 231, 250).

## II.   Teleconference Hearing before the ALJ

On December 8, 2021, Plaintiff appeared via teleconference before an ALJ to testify about her mental and physical conditions from January 1, 2018, to May 16, 2020. (R. at 1636). She was represented by an attorney, and her husband and a vocational expert ("VE") were present to testify. (R. at 1636).

Plaintiff testified that her chronic fatigue and concentration and memory issues kept her from working more than ten hours per week as an insurance agent, which she mostly worked in smaller increments of time. (R. at 1638, 1648). She explained that simple tasks, like reading or making a call, would take her significantly more time to complete, contain errors, and cause her to need long breaks. (R. at 1638–39, 1648). Speaking to her general mental difficulties, Plaintiff explained how she suffers from dissociation, which causes a loss of time with no memory. (R. at

12

1641–46). Plaintiff stated she would be in a state of dissociation for up to thirty minutes at a time and explained how she has different triggers, e.g., a thought about her son or the sound of her insulin pump. (R. at 1643). Plaintiff claimed her severe depression causes numerous issues, including struggles with self-harm and negative thoughts. (R. at 1646). She described her depression as having an impact on her ability to talk to other people, especially women, as she was afraid she was "toxic" to any pregnant person. (R. at 1646). Plaintiff claimed many aspects of her physical health prevented her from working, as well. (R. at 1650). Her diabetes, according to Plaintiff, was under control but directly contributed to her mental health issues. (R. at 1650). Plaintiff stated she had episodes of tachycardia, which caused breathlessness, a racing pulse, and abnormal sweating. (R. 1651). She noted that her physical and mental difficulties hindered her ability to do chores at home and generally care for herself and her family. (R. at 1653–54).

Plaintiff's husband of seven years, John H., then testified to his experience with Plaintiff's self-harm, dissociation, and inability to concentration. (R. at 1655–61). He recounted that he had personally seen Plaintiff strike herself in the face numerous times, lash herself with a leather belt, and use a staple gun on her body. (R. at 1655). When asked about Plaintiff's dissociation, her husband confirmed that she would be frustrated and "out of sorts" after experiencing dissociation. (R. at 1658–59). He similarly reported that Plaintiff's difficulties caused the housework to fall on him, and that he reminded her about personal hygiene care. (R. at 1660–61).

To provide necessary background for the VE, the ALJ asked Plaintiff about her work history. (R. at 1662–66). The VE then testified to the classifications of Plaintiff's work and other suitable jobs available in the national economy. (R. at 1666). He stated the Dictionary of Occupational Titles ("DOT") rated Plaintiff's previous jobs as a case worker and team leader a skill level of seven, light intensity level as defined, but medium intensity as described by Plaintiff (R. at 1666–67). The VE rated Plaintiff's first insurance job as a skill level of six, with light to medium intensity. (R. at 1667).

In response to a hypothetical in which a person with the same characteristics as Plaintiff had the same residual functional capacity to perform a light range of work and the same work-related limitations, the VE stated that hypothetical individual would not be able to perform Plaintiff's previous jobs. (R. at 1668). However, the VE noted three other jobs (router, mail clerk, and office helper) would be feasible, and roughly 86,000 of those jobs were available in the national economy. (R. at 1668–69). However, the VE further testified there would likely be no competitive employment in the national economy if the same hypothetical person were absent two days per month. (R. at 1669). The same would be true if that hypothetical individual would be off-task at least sixteen percent of the workday. (R. at 1669).

## III.   Decision of the ALJ

A five-step sequential analysis is employed to determine whether a plaintiff is disabled. 20 C.F.R. § 404.1520; *Bowen v. Yuckert,* 482 U.S. 137, 137 (1987). At step one, the ALJ determines whether Plaintiff is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ determines whether Plaintiff's impairments are severe. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "severe" if

it significantly limits Plaintiff's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). At step three, the ALJ determines whether any of Plaintiff's impairments, alone or in combination, meet or equal one of the Listings in Appendix 1 to Subpart P of Part 404 of C.F.R. 20 C.F.R. § 404.1520(a)(4)(iii). At step four, the ALJ evaluates Plaintiff's residual functional capacity ("RFC") and determines whether Plaintiff can perform past relevant work based on the RFC. 20 C.F.R. § 404.1520(a)(4)(iv). The RFC represents the most a Plaintiff can do given his limitations. 20 C.F.R. § 404.1545(a). An RFC includes limitations for all medically determinable impairments, including non-severe impairments. 20 C.F.R. § 404.1545(a)(2). Finally, at step five, the ALJ determines whether Plaintiff can perform other work. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ may require the testimony of the VE to make a step five determination. The burden of proof is on the plaintiff for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Applying the five-step inquiry, the ALJ here concluded Plaintiff was not disabled from January 1, 2018, to May 16, 2020. (R. at 1601). The ALJ did find Plaintiff's diabetes, obesity, major depressive disorder, generalized anxiety disorder, attention deficit disorder, post-traumatic stress disorder, and disassociation disorder could be classified as medically determinable severe impairments under 20 C.F.R. § 404.1520(c), but she did not find that Plaintiff's back injury, tachycardia, or interstitial cystitis qualified. (R. at 1600–01). The ALJ found none of Plaintiff's impairments met the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. at

15

1601). The ALJ concluded Plaintiff could not perform her past relevant work but could adjust to other work that exists in significant numbers in the national economy. (R. at 1625). In making this finding, the ALJ found the opinions of the state agency consultants persuasive, and made the following RFC determination:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can only occasionally operate a motor vehicle. She can make simple, routine, and repetitive tasks and make simple work-related decisions. She can work at a consistent pace throughout the workday but cannot perform production rate or pace work such as assembly line work. She can occasionally interact with supervisors and co-worker's incidental to the work being performed with no direct contact with the general public. She can respond appropriately to occasional, gradually introduced changes in a routine work setting.

(R. at 1603).

## LEGAL STANDARD

This Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court is obligated to "review the entire record, but [does] not replace the ALJ's judgment with [its] own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility." *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). It is the ALJ's responsibility to "build an accurate and logical bridge from the evidence to her conclusion," and the ALJ "may not ignore evidence that undercuts her conclusion." *Spricher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (citations and internal quotation marks omitted). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). At the same time, judicial review is not abject; the Court does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### DISCUSSION

Plaintiff raises numerous arguments to explain how the ALJ erred in determining her not eligible for disability benefits under the Act. The dispute centers on whether the ALJ properly considered the opinion evidence and assessed Plaintiff's work-related limitations. First, she argues the ALJ erred by failing to build a logical bridge from the evidence to her decision to discredit the medical opinions of Plaintiff's four treating sources. (Doc. 12 at 9–18). The ALJ is accused of both "playing doctor" and "cherry-picking" evidence to support her conclusion. (Doc. 12 at 9–18). Second, Plaintiff argues the ALJ unreasonably evaluated her credibility with respect to the frequency and severity of her symptoms. (Doc. 12 at 22–23). Third, Plaintiff puts forth the argument that the ALJ failed to formulate an adequate RFC and ask the VE hypothetical questions that included all limitations supported by the record, e.g.,

those contained in the treating providers' opinions and shared by Plaintiff. (Doc. 12 at 18–22). Plaintiff's primary relief requested is to remand this case for further consideration consistent with a finding of disability. (Doc. 12 at 23).

The Commissioner, in opposition, argues Plaintiff has not met her burden and has not demonstrated error on the part of the ALJ. Instead, the Commissioner states the ALJ used substantial evidence to support her evaluation of the record and opinion evidence. (Doc. 17 at 2–11). Further, the remaining arguments asserted by Plaintiff lack merit and are not supported by relevant case law, according to the Commissioner. (Doc. 17 at 11–13). For relief, the Commissioner seeks affirmance. (Doc. 17 at 13).

## I.   Evaluation of Medical Opinion Evidence

Plaintiff's first argument is that the ALJ improperly gave little weight to the medical opinions of four treating providers (Dr. Amanullah, APN Garmon, Dr. White, and Mr. Nordstrom) as inconsistent and unsupported by the record.[4] The ALJ instead gave greater weight to the opinions of four state agency consultants (Dr. Mehr, Dr. Fyans, Dr. Smith, and Dr. Aquino), finding those opinions supported by and

---

[4] Of note, Plaintiff's argument relies on outdated authority. Plaintiff states the ALJ should "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]" because of his greater familiarity with the claimant's conditions and circumstances," citing *Minnick v. Colvin*, 775 F.3d 929 (7th Cir. 2015). *Minnick* applies the regulations found in 20 C.F.R. § 404.1527(c), which instruct ALJs to give treating physicians' opinions greater weight and apply only to cases filed before March 27, 2017. *See Fata H. v. Kijakazi*, No. 21-cv-4161, 2023 WL 6929570, at *3 (N.D. Ill. Oct. 19, 2023). Plaintiff filed her claim in 2018. (R. at 330). Therefore, under the applicable regulations found in § 404.1520c, an ALJ is "not obligated to give controlling weight to the treating physician" if the opinion is found not worthy of such weight. *Crowell v. Kijakazi*, 72 F.4th 810, 815–16 (7th Cir. 2023). Plaintiff properly cites to 20 C.F.R. § 404.1520c(c)(3)(v), which allows an ALJ to consider whether the medical source has examined the plaintiff.

consistent with the objective medical record, which Plaintiff argues was improper. The Commissioner, in response, argues that the ALJ sufficiently explained her reasoning, and built an accurate and logical bridge from the evidence to her conclusion to give greater weight to the state agency consultants.

A "medical opinion" is a statement from a medical source about what the claimant can still do despite her impairments and whether she has impairment-related limitations in her ability to perform the physical or mental demands of work activities. 20 C.F.R. § 404.1513(a)(2). The ALJ will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinions or prior administrative medical findings, including those from the claimant's treating providers. 20 C.F.R. § 404.1520c(a). Instead, the ALJ will articulate how "persuasive" she finds all of the medical opinions and prior administrative medical findings in the case record. The factors of "supportability" (the more support the source offers, the more persuasive the opinion will be) and "consistency" (the more consistent the opinion is with the other evidence, the more persuasive it will be) are the most important in determining how persuasive the ALJ finds a source's medical opinions or prior administrative medical findings to be. 20 C.F.R. § 404.1520c(b)(1), (c)(1). Other factors considered include the source's relationship with the claimant, specialization, and familiarity with the other evidence in the claim record or an understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Statements by medical sources on issues reserved to the Commissioner, such as whether the claimant is disabled or unable to perform regular

and continuing work, are "inherently neither valuable nor persuasive to the issue of whether [the claimant is] disabled," so the ALJ need not provide any analysis about how he considered such statements. 20 C.F.R. § 404.1520b(c).

ALJs are required to consider the objective medical evidence when evaluating the supportability and consistency of a medical opinion. 20 C.F.R. § 404.1520c(c)(1)– (2). It is acknowledged that when a treating physician sits down to fill out a disability report, he may misremember the patient's symptoms or deliberately exaggerate them. *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) (citation omitted) ("The patients' regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."). The instant matter is a case of competing expert medical opinions. Plaintiff's four treating sources opined she could not sustain employment, while four state agency consultants found Plaintiff could perform light work with additional limitations. Thus, it is especially important here for the ALJ to build an accurate and logical bridge; in other words, the Court must be able to "trace the path of the ALJ's reasoning from evidence to conclusion." *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015).

### A.  Dr. Syed Amanullah

Dr. Amanullah has treated the Plaintiff as her psychiatrist since July 19, 2016. (Doc. 12 at 10). He provided his medical opinion twice. The first time, on September 17, 2018, Dr. Amanullah completed a check-box form indicating that Plaintiff struggled to complete tasks, had increased stress, isolated herself, and could not interact in social settings. (R. at 1409). The form further indicates that Plaintiff struggled with suicidal thoughts and self-injurious behavior and had extreme

20

limitations in the mental categories set forth in the B criteria. (R. at 1409–11). In a letter dated July 10, 2019, Dr. Amanullah opined that Plaintiff "suffers from severe anxiety and a major depression along with chronic PTSD that prohibits her from doing well in social situations." (R. at 1929). The letter linked her struggle to the miscarriage, which caused "poor self[-]esteem and suicidal ideations with self[-]injurious behavior," along with "panic attacks around other people in social situations." (R. at 1929). Dr. Amanullah then opined that Plaintiff was not able to keep up with her work responsibilities and had a persistent lack of motivation and concentration. (R. at 1929). His final opinion was that Plaintiff was not able to function at a level that would enable her to sustain any type of gainful employment. (R. at 1929).

As stated, the ALJ assigned limited weight to Dr. Amanullah's opinions. The ALJ found that the treatment notes and other medical records generally did not corroborate the level of impairment Dr. Amanullah identified. (R. at 1620–21). It was further noted that Plaintiff's ability to perform work duties on a part-time basis— including traveling, driving, giving presentations, attending regional meetings, and collaborating with other insurance agents—was inconsistent with the substantial limitations found by Dr. Amanullah. (R. at 1621). The ALJ also reasoned that some of Dr. Amanullah's suggested limitations were based on Plaintiff's subjective reports and one incident at Dr. Leonardi's office. (R. at 1621). Generally, however, Dr, Amanullah's treatment notes indicated stable conditions, normal examination findings, and that Plaintiff presented herself as casually dressed, well-groomed, and

21

cooperative. (R. at 1620–21). The ALJ stated that Dr. Amanullah's opinion on Plaintiff's poor insight and "perseverating on the loss of her child" was considered in her work limitations in the RFC but did not consider his opinion on the final issue of whether Plaintiff can sustain gainful employment. (R. at 1621).

Plaintiff suggests that the ALJ improperly considered that Dr. Amanullah's opinions were based on subjective reports from Plaintiff herself. (Doc. 12 at 11–12). She first argues that the ALJ failed to consider that Dr. Amanullah was using his "professional training and experience" when he gave his opinion. (Doc. 12 at 11–12). However, as an initial matter, the ALJ did consider Dr. Amanullah's experience with the patient and his expertise. (R. at 1620) (writing "Dr. Amanullah has seen the claimant as a patient for the past three years" and that "Dr. Amanullah has a psychiatric specialty"). Amongst other reasons, the ALJ then pointed to treatment notes from this time period to reason that Dr. Amanullah was mostly performing "routine medication management," as on the date of the check-box form opinion, "the only change noted was she was off Lexapro and Adderall for heart issues." (R. at 1620). Thus, the ALJ concluded that the opinion was not consistent with the objective medical record and instead was "heavily reliant on the claimant's assertions over objective medical findings." (R. at 1620).

The Seventh Circuit has repeatedly held that an ALJ is entitled to discount a medical opinion that rests on the claimant's self-reporting. *See, e.g., Apke v. Saul*, 817 F. App'x 252, 256–57 (7th Cir. 2020); *Alvarado v. Colvin*, 836 F.3d 744, 748 (7th Cir. 2016); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). Plaintiff cites *Price v.*

*Colvin*, 794 F.3d 836, 840 (7th Cir. 2015), to show that there is an exception to this rule for psychiatric and psychological evaluations. (Doc. 12 at 11). In *Price*, the Seventh Circuit stated that "psychiatric assessments normally are based primarily on what the patient tells the psychiatrist" and that psychiatrists have "professional training and experience" that teaches them "how to discount exaggerated statements by [their] patients." 794 F.3d at 840. However, this is not to say that an ALJ may never consider the fact that an assessment was largely based on subjective reporting. Rather, the question from *Price* is whether the report indicates that the provider used "professional expertise" to assess the claimant's credibility. *See Behlman v. Saul*, No. 19-C-1147, 2020 WL 6889187, at *5 (E.D. Wis. Nov. 24, 2020) (finding the ALJ's decision to discount mental health opinions was reasonable because "there [was] no indication that [the doctor] assessed [the plaintiff's] complaints and subjective reports of her symptoms 'through the objective lens of [his] professional expertise' "); *Hager v. Kijakazi*, 20-cv-788, 2021 WL 3088060, at *5 (W.D. Wis. July 22, 2021) (finding the ALJ did not err by considering a psychologist's reliance on the plaintiff's subjective reporting in weighing the opinion, because the psychologist did not connect his objective observations or the results of any tests to his findings).

Here, the ALJ was permitted to give less weight to Dr. Amanullah's opinions in part, finding them based on subjective reporting from Plaintiff, because the opinions are inconsistent with Dr. Amanullah's treatment notes and examination findings. The ALJ properly pointed to the little-to-no evidence showing Dr. Amanullah used his professional expertise in opining that Plaintiff had severe

impairments calling for such extreme limitations. *See Michael K. v. Saul*, 20 C 2696, 2020 WL 7337821, at *8 (N.D. Ill. Dec. 14, 2020) (finding that the ALJ properly rejected an "uncritical" opinion from a psychiatrist that the plaintiff was disabled, where the opinion was contradicted by normal objective findings). In doing so, the ALJ discussed how Plaintiff's part-time work activities, daily-living activities, Dr. Amanullah's "routine follow-up" appointments, and normal examination findings are in direct opposition to the opined limitations. (R. at 1620). The ALJ's analysis was logically drawn from and properly based on this inconsistency; therefore, the ALJ did not commit error.

Plaintiff next alleges the ALJ "played doctor" when she reasoned that Dr. Amanullah's extreme proposed limitations may be based on, or in reaction to, the self-harm incident at Dr. Leonardi's office, when Plaintiff discussed what she thought was her role in the miscarriage. (Doc. 12 at 12). The Court does not see how the ALJ's analysis on supportability and consistency of a medical opinion is "playing doctor." Plaintiff goes on to argue that Dr. Amanullah was "in a much better position to determine how [Plaintiff's] PTSD symptoms reflect the trauma . . . ." (Doc. 12 at 12). The ALJ did not deny Plaintiff experienced a traumatic event; she simply compared Dr. Amanullah's treatment notes and examination findings to his opinions, as required by the regulations, and found them to be inconsistent. *See* 20 C.F.R. § 404.1520c(c)(1)–(2).

Plaintiff similarly accuses the ALJ of highlighting only evidence from the record that supported her conclusion. (Doc. 12 at 10–11). An ALJ cannot "cherry-pick"

evidence, highlighting facts that corroborate her position while ignoring those that undermine it. *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016). Nor can an ALJ perform a cursory analysis and "dismiss a line of evidence without any discussion." *Pepper v. Colvin*, 712 F.3d 351, 363 (7th Cir. 2013). Plaintiff argues that the ALJ failed to specifically mention the photographs of self-harm, the previous hospitalization, and statements from Mr. Nordstrom and Dr. White that are consistent with Dr. Amanullah's opinions. (Doc. 12 at 10). To start, it is untrue that the ALJ failed to mention Plaintiff's previous hospitalization and the statements from Mr. Nordstrom and Dr. White. (R. at 1604–05, 1615, 1618–19). An ALJ's decision is reviewed as a whole. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004). Where exactly the ALJ mentioned the evidence is not important upon review. *Taylor v. Kijakazi*, No. 2:22-cv-32, 2023 WL 334601, at *5 (N.D. Ind. Jan. 20, 2023). Nevertheless, it is well-settled that an ALJ does not have to mention each individual piece of evidence. *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016). The ALJ discussed Plaintiff's self-harm episodes at numerous points in her decision, indicating that she did not "dismiss a line of evidence without any discussion." (R. at 1608, 1610, 1611, 1614); *Pepper*, 712 F.3d at 363. And because she was not required to mention each piece of evidence, failure to cite the photographs of self-harm is not error. *Loveless*, 810 F.3d at 507.

Plaintiff's final argument is that the ALJ improperly dismissed Dr. Amanullah's opinion that Plaintiff is not able to function at a level necessary to sustain any type of employment, finding it "an issue reserved for the [C]ommissioner

25

and of limited probative value." (Doc. 12 at 12). She relies on *Lambert v. Berryhill* for the contention that if "a claimant qualifies for benefits is a question of law, but a medical opinion that a claimant is unable to work is not an improper legal conclusion." 896 F.3d 768, 776 (7th Cir. 2018). However, the Seventh Circuit has often held *conclusory statements* that a claimant is unable to work are "entitled to no weight, even coming from a treating physician." *Spies v. Colvin*, 641 F.App'x. 628, 636 (7th Cir. 2016) (emphasis added); *Ray v. Saul*, 861 F.App'x. 102, 105–06 (7th Cir. 2021).

Here, the following statement from Dr. Amanullah is at issue: "Given her history of struggling with social skills, persistent lack of concentration and severe anxiety with depression, I feel she is not able to function at a level to be able to sustain any type of gainful employment or work." (R. at 1929). This Court disagrees with Plaintiff—the conclusory statement by Dr. Amanullah was on an issue reserved for the Commissioner and the ALJ did not have to analyze it. 20 C.F.R. § 404.1520b(c)(3)(i); *see also Janisha C. v. Kijakazi*, No. 22-cv-00381, 2023 WL 5017943, at *5 (N.D. Ill. Aug. 7, 2023) (finding the ALJ correctly disregarded opinion of pulmonologist that Plaintiff "frequently is unable to work or engage in normal activities when her asthma is flared up" because it was simply a conclusion on an issue reserved to the Commissioner); *Dustane B. v. Kijakazi*, No. 21-cv-446, 2023 WL 2706640, at *4 (N.D. Ind. Mar. 30, 2023) (stating the ALJ need not provide any analysis about how they considered letter from doctor stating "at this time, due to multiple mental and physical health problems, [Plaintiff] is unable to work").

Nonetheless, the ALJ considered Dr. Amanullah's statement with the analysis of his two opinions. (R. at 1621). After noting the issue is reserved for the Commissioner, the ALJ discussed how the opinion remains inconsistent with Plaintiff's part-time work, stable condition at medical appointments, and regular examination findings. (R. at 1621). This argument simply has no merit.

For all these reasons, the ALJ provided sufficient analysis, which a reasonable mind could accept as supporting the ALJ's conclusion, for discounting Dr. Amanullah's opinions. *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022) (the court does "not review medical opinions independently but rather review[s] the ALJ's weighing of those opinions for substantial evidence," and only "overturn[s] that weighing if no reasonable mind could accept the ALJ's conclusion"). In other words, the ALJ adequately explained her reasoning and did not commit reversible error in giving Dr. Amanullah's opinion less weight.

B.    *APN Gregory Garmon*

APN Gregory Garmon opined on Plaintiff's ability level once, on October 1, 2018. (R. at 1495). He stated Plaintiff had received diabetes treatment at his office since 2015. (R. at 1495). He opined Plaintiff "routinely" demonstrated decreased concentration and difficulty with complex direction and complex education. (R. at 1495). Plaintiff's diabetes care required "multiple daily complex interactions to maintain health and life[,]" and Plaintiff struggled to maintain "good control" over her condition due to her "ongoing behavioral [diagnoses]." (R. at 1495). APN Garmon stated her diabetes is a compulsion and he feels Plaintiff would be unable to "maintain long-term gainful employment." (R. at 1495).

27

The ALJ ultimately found APN Garmon's opinion less persuasive, labeling the statements as generalizations, and finding the opinion not supported by his own treatment notes and not consistent with the record in general. (R. at 1619–20). In her decision, the ALJ explained that APN Garmon's opinion conflicted with the record, which revealed Plaintiff's diabetes had been generally controlled without any significant persistent symptoms, no hospitalizations, and regular routine follow up for care. (R. at 1619–20). The ALJ found that the record similarly did not support APN Garmon's contention that Plaintiff struggled with the complex interactions required by her diabetes—the ALJ instead cited APN Garmon's notes, which detailed technology difficulties and increased carbohydrate intake as the causes of Plaintiff's struggles. (R. at 1620). Ultimately, APN Garmon's opinion was inconsistent with the objective medical evidence and lacked specific limitations; however, the ALJ considered the opinion that Plaintiff has moderate stressors related to her overall impairments, including the care of her diabetes, in assessing her RFC. (R. at 1620).

Plaintiff takes issue with the ALJ's analysis, arguing that the ALJ failed to adequately explain her decision to discount APN Garmon's statements related to Plaintiff's concentration issues. (Doc. 12 at 17). Plaintiff states it is "reasonable to believe an endocrinologist treating a person's diabetes may be less likely to document psychological symptoms such as distress," and that APN Garmon's opinion is bolstered by Dr. Amanullah's assessment that Plaintiff "continues to perseverate on [the] loss of her child." (Doc. 12 at 17–18).

28

The ALJ pointed to inconsistencies between APN Garmon's own treatment notes and his opinion, which provides a legitimate reason to discount the opinion. *See Baptist v. Kijakazi*, 74 F.4th 437, 444 (7th Cir. 2023) (finding treating physician's opinion may be discounted where it is internally inconsistent or is inconsistent with other objective evidence in the record, such as physician treatment notes). Plaintiff's argument, that the ALJ erroneously failed to cite the mental-health record and consider that APN Garmon was less likely to document her psychological symptoms, is off base. Her cited case, *Thomas v. Berryhill*, explains that an ALJ cannot ignore a substantial portion of the record in a decision. 916 F.3d 307, 312 (4th Cir. 2019). There, an ALJ failed to include evaluations from mental health specialists, and instead chose to analyze the mental health evaluations from "physicians treating [plaintiff's] chronic foot pain." *Id*. The Court fails to see how this case is applicable to the ALJ's decision. The ALJ here thoroughly discussed the mental-health evaluations from Plaintiff's providers, especially those from Dr. Amanullah, and did not give APN Garmon's findings, including that Plaintiff "presented in no apparent distress," undue weight. In response to Plaintiff's argument that the ALJ should have bolstered APN Garmon's opinion with Dr. Amanullah's statement on Plaintiff's continued focus on the loss of her son, this Court restates that the ALJ's decision is considered as a whole. *Rice*, 384 F.3d at 370 n.5. Although not in the preferred paragraph, the ALJ discussed this piece of evidence and considered it in formulating Plaintiff's RFC. (R. at 1621). In sum, as her reasoning is traceable from evidence to conclusion, the ALJ did not err in her analysis of APN Garmon's opinion.

29

C.    *Dr. Jessica White*

Dr. White gave her opinion on September 28, 2018. (R. at 1492). It included a summary of Plaintiff's medical care under Dr. White, including Plaintiff's referral to psychiatry and counseling services. (R. at 1492). Dr. White stated that Plaintiff's "episodes where she would lose time and not know what happened," "flashbacks[,]" and "extreme fatigue" did not subside with treatment. (R. at 1492). Additionally, she cataloged Plaintiff's PTSD symptoms, like uncontrollable crying, concentration difficulties, and panic attacks, as well as her "self-punish[ing]" behaviors like eating inappropriately for her diabetes diagnosis. (R. at 1492). She stated Plaintiff's daily life had been affected and she generally had declined from a "high functioning individual with some mild stress and fatigue." (R. at 1492). Dr. White opined "[d]ue to her severe fatigue and psychiatric diagnosis she has been unable to maintain gainful employment." (R. at 1492).

The ALJ gave little weight to Dr. White's opinion for multiple reasons. She found it unsupported by and inconsistent with the record—especially with Dr. White's own evaluations and treatment notes. (R. at 1619). Additionally, the ALJ pointed out that Dr. White did not submit treatment notes from the relevant time period and cited symptoms of Plaintiff's diagnoses but failed to provide limitations in terms of work. (R. at 1619).

Plaintiff argues the ALJ failed to properly evaluate Dr. White's opinion pursuant to the factors in § 404.1520c. (Doc. 12 at 16). However, the articulated reasons for finding Dr. White's opinion less persuasive reveal the ALJ complied with the regulations. She explicitly found Dr. White's assertion that Plaintiff's self-harm

30

was increasing as inconsistent with Plaintiff's report that she had been engaging in these types of behaviors weekly since age four. (R. at 1619). Additionally, the ALJ found Dr. White's statements that Plaintiff's mental health prohibited her from working to be unsupported by the medical records at that time, as Plaintiff's examination findings were normal. (R. at 1619 citing 1054–55, 1438, 1619). Therefore, the ALJ concluded that Dr. White's opinion was generally unsupported by her own treatment record (which only included documentation through 2018), and inconsistent with the record. As discussed, the "most important" factors an ALJ must consider in evaluating a medical opinion are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). The ALJ clearly considered those factors here.

Plaintiff then contends the ALJ failed to consider Dr. White's acknowledgement that Plaintiff was a high-functioning member of society, and in the years since her miscarriage, she began to self-punish. (Doc. 12 at 16). The Court considers this to be untrue. The ALJ specifically mentioned Dr. White's statement that Plaintiff "continued to decline over the last few years[.]" (R. at 1619). She then specifically mentioned Dr. White's recounting of Plaintiff's self-punishment through "eating inappropriately, which worsened diabetes control [*sic*] over time, [and] it progressed to self-harm with slapping self or hitting self with a belt." (R. at 1619). Plaintiff's argument is misplaced.

Similarly, Plaintiff takes particular issue with the ALJ's failure to analyze Plaintiff's self-harm episode in Dr. Leonardi's office in her consideration of Dr. White's opinion. (Doc. 12 at 16). Again, the Court reiterates that the ALJ's decision

is not taken in parts. *Rice*, 384 F.3d at 370 n.5. The details regarding the incident at Dr. Leonardi's office were thoroughly discussed by the ALJ, who later considered the effects of the behavior as well. (R. at 1608, 1621). There is no requirement that an ALJ must list each piece of evidence in her decision, *Loveless*, 810 F.3d at 507, let alone a requirement that each piece of evidence must be analyzed in specific sections of the decision. Nonetheless, the ALJ frequently noted that multiple sources gave opinions that were consistent with each other, like Dr. White and Mr. Nordstrom; however, the ALJ analyzed the statements against the record, and found them inconsistent. This was proper. *See Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) ("An ALJ may discount a treating physician's medical opinion . . . as long as he 'minimally articulate[s] his reasons for crediting or rejecting evidence of disability.' ") (citation omitted).

Plaintiff's last argument is that the ALJ erroneously dismissed Dr. White's statement on whether Plaintiff was able to work as an issue reserved for the Commissioner. (Doc. 12 at 15–16). Like Dr. Amanullah's statement, this Court disagrees that Dr. White's assertion, stating "[d]ue to her severe fatigue and psychiatric diagnosis she has been unable to maintain gainful employment," was anything more than a conclusory statement without functional limitations. ALJs are permitted to dismiss those without further consideration. *Spies,* 641 F.App'x. at 636. However, as was the case with Dr. Amanullah, the ALJ did analyze Dr. White's opinion in full for its consistency and supportability, despite noting that this

statement was on an issue reversed for the Commissioner. (R. at 1619). The ALJ's analysis of Dr. White's opinion was proper.

D.   *Mr. John Nordstrom*

On June 4, 2018, Mr. John Nordstrom provided his opinion to the ALJ for consideration. (R. at 1391). In part, he states:

> I observed a symptom of high reactivity to particular kinds of events. Upon exploration I learned that [Plaintiff's] childhood was characterized by much abusive parenting. She has experienced and been a witness to trauma. Presently she is plagued by memories of what has traumatized her. As a result of this and because of flashbacks she is no longer able to attend church services because there are people present who have the effect of triggering [Plaintiff] emotionally. The intensity of her reaction is severe enough to include suicidal ideations. Her reactivity also interferes with her relating to co-workers. Typically [Plaintiff] feels detached from others. She easily becomes irritable and angry. My view is that her condition interferes significantly with her professional and social functioning.

(R. at 1391). Later, on January 30, 2019, and June 24, 2019, Mr. Nordstrom sent two additional letters regarding Plaintiff's ability levels. (R. at 1574–77, 1927). The letters provide detail into Plaintiff's background, and Mr. Nordstrom states that he has only seen Plaintiff "in the context of a pastoral role." (R. at 1576). He opined Plaintiff cannot maintain employment at this time due to the mental health symptoms he listed and described. (R. at 1577). His final letter seeks clarification that he was aware of Plaintiff's self-harm episodes. (R. at 1927). The ALJ found Mr. Nordstrom's assertions regarding Plaintiff's functioning to be of little value because there are no supporting treatment notes chronicling his counseling with Plaintiff, and because the objective medical record is not consistent with the extreme limitations identified. (R. at 1618–19).

Plaintiff argues the ALJ erred in this conclusion, as she "unreasonably highlighted" Plaintiff's part-time work and travel as inconsistent with the severe limitations opined by Mr. Nordstrom while ignoring supportive evidence.[5] (Doc. 12 at 13). Plaintiff includes an argument that the ALJ did not properly consider Mr. Nordstrom's opinion pursuant to the § 404.1520c factors. (Doc. 12 at 15).

Mr. Nordstrom saw Plaintiff in the role of her pastor. (R. at 1576). Thus, Mr. Nordstrom is considered a nonmedical source pursuant to 20 C.F.R. § 404.1502(a), and the ALJ was "not required to articulate how [she] considered evidence from nonmedical sources using the requirements in . . . this section," 20 C.F.R. § 404.1520c(d). When a nonmedical opinion is introduced, an ALJ is only required to consider the statements, which is sufficient even if only in passing. *See Katie L.K. v. Comm'r of Soc. Sec.*, No. 1:21-cv-01280, 2023 WL 1785234, at *4 (C.D. Ill. Feb. 6, 2023) (collecting cases where the plaintiff unsuccessfully argued the ALJ "erred by failing to articulate his or her reasons for rejecting those statements" from nonmedical sources where the ALJ at least mentioned the statement). Plaintiff's argument that the ALJ failed to assess Mr. Nordstrom's opinions pursuant to the factors in § 404.1520c(c) is without merit, as the ALJ did not have to.

The ALJ's analysis went beyond what was required of her, as she summarized the three letters and considered the supportability and consistency of Mr.

---

[5] The Court notes that Plaintiff's cited case law, like *Murphy v. Colvin*, 759 F.3d 811 (7th Cir. 2014) and *Weaver v. Berryhill*, 746 F. App'x 574 (7th Cir. 2018) contain arguments related to ALJs impermissibly highlighting vacation or part-time work activities in assessing the plaintiff's credibility and subjective symptoms. The cases are less applicable to Plaintiff's arguments, as she cited them in an effort to discredit the analysis of a nonmedical opinion.

Nordstrom's opinions with the record. (R. at 1618–19). In doing so, the ALJ considered Plaintiff's travel and part-time work, which Plaintiff takes issue with. However, an ALJ can consider part-time work as a factor in judging disability. *See Crowell v. Kijakazi*, 72 F.4th 810, 817–18 (7th Cir. 2023) ("The administrative law judge, however, could certainly consider [the plaintiff's] part time work babysitting in his big-picture evaluation of her capabilities."); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008). But it is also true that an ALJ must be careful to not equate part-time work with the ability to engage in full-time employment. *Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017). Here, the ALJ cited Mr. Nordstrom's opinions as "inconsistent with the documented medical record, objective clinical exams, continued work activities and other activities including travel[.]" (R. at 1619). Plaintiff's work activity was only part of the ALJ's "big-picture evaluation of her capabilities" used to give less weight to Mr. Nordstrom's opinions. (R. at 1619); *Crowell*, 72 F.4th at 817–18. The ALJ's use of Plaintiff's work duties as evidence that her mental impairments may not limit her as much as Mr. Nordstrom was opining was permissible, as it lends itself to the supportability and consistency of the opinions.

Plaintiff's issue with the ALJ's consideration of her vacation issues has some merit. An ALJ can properly consider vacation and travel activities for consistency with a medical provider's opinion. In *Fata H. v. Kijakazi*, the ALJ did so when she found a provider's opinion that the plaintiff had moderate to marked limitations in almost all areas of mental abilities inconsistent with the plaintiff's recent, months-long travel to Bosnia to visit family. No. 21-cv-4161, 2023 WL 6929570, at *6 (N.D.

Ill. Oct. 19, 2023). In support, the *Fata H.* ALJ explained how the plaintiff's travel required her to understand travel preparations, navigate the airport alone, and be in crowds in the airport and in the airplane for hours. *Id*. Given the severe limitations opined by the medical provider and the ALJ's known details of the plaintiff's trip, the consideration was proper. *See also Behlman v. Saul*, No. 19-C-1147, 2020 WL 6889187, at *6 (E.D. Wis. Nov. 24, 2020) (writing the ALJ did not err in considering known details of the claimant's trip, which included serving as a friend's caretaker, in assessing her RFC and weighing the medical opinion evidence). The same details are not available here (the ALJ only knew that Plaintiff went for one-week trip to Costa Rica with her family, and that she was stung by jellyfish) to properly understand what Plaintiff did and did not do on her trip that was inconsistent with Mr. Nordstrom's opinions.

However, the ALJ's consideration of Plaintiff's travel was minimal in her analysis of the medical opinion evidence. An error is harmless "if the error leaves us convinced that the ALJ would reach the same result on remand." *Lambert*, 896 F.3d at 776. If this Court can "predict with great confidence what the result on remand will be," then it may decline to remand. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). The ALJ's consideration of Plaintiff's travel activities was minor compared to her thorough discussion of the inconsistencies found in the objective medical record, regular examination findings by numerous treating medical professionals, and upon review of Plaintiff's daily-living activities, like her part-time work duties. Simply put, the ALJ's evaluation of Mr. Nordstrom's opinions and the medical opinion

evidence would more than likely reach the same result if remanded. The ALJ did not commit reversible err in her assessment of Mr. Nordstrom's opinions.

## II.   Credibility Analysis

Plaintiff next asserts that the ALJ improperly found her statements regarding her subjective symptoms to be inconsistent with the record. (Doc. 12 at 22–23). In particular, Plaintiff complains the ALJ found her testimony regarding the severity of her symptoms to be inconsistent with her work and vacation activities. (Doc. 12 at 22–23). The Commissioner argues that this was not in error, as the ALJ is allowed to evaluate the consistency of Plaintiff's subjective reports with the record as a whole. (Doc. 17 at 11–13).

An ALJ's evaluation of subjective symptoms will be upheld unless it is patently wrong. *Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir. 2012). To show that the evaluation is patently wrong, a claimant must demonstrate that the evaluation lacks "any explanation or support." *Horr v. Berryhill*, 743 F.App'x. 16, 20 (7th Cir. 2018). The assessment of a claimant's symptoms is through a two-step process in which the ALJ first determines whether the claimant has a medically determinable impairment that could reasonably be expected to produce her symptoms. *Wilder v. Kijakazi*, 22 F.4th 644, 654 (7th Cir. 2022) (applying guidelines from SSR 16-3p). Then, the ALJ must evaluate the "intensity, persistence, and functionally limiting effects" of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities. *Id*. In making this evaluation, the ALJ should consider the entire case record, along with (1) the claimant's daily activities; (2) location, duration, frequency, and intensity of pain or symptoms; (3) precipitating

and aggravating factors; (4) type, dosage, and side effects of medication; (5) treatment other than medication; (6) any measures other than treatment an individual uses to relieve symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions. 20 C.F.R. § 416.929(c)(3).

At step one, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms[.]" (R. at 1604). The ALJ provided the following reasons to support the finding at step two: (1) objective medical findings did not support the limitations to which Plaintiff testified; (2) Plaintiff's statements were inconsistent with her providers' treatment notes; (3) the ALJ included work-related limitations based on the record evidence; and (4) Plaintiff's daily activities, work duties, and ability to travel showed she was able to function more independently than she testified. (R. at 1614–16).

The half-page argument put forth by Plaintiff includes allegations that the ALJ erred in assessing Plaintiff's travel and part-time work activities, stating that her flexible schedule allows her to perform such tasks while a full-time job would not. (Doc. 12 at 22–23). In her decision, the ALJ adequately pointed to inconsistencies in Plaintiff's testimony in support of her conclusion finding Plaintiff less credible. For example, Plaintiff testified that she was engaging in self-injurious behaviors once weekly since age four; however, the record revealed she told Dr. Amanullah that she had not engaged in such behavior for periods up to two months. (R. at 1614). Plaintiff also testified at the December 2018 hearing that she was dissociating weekly, but Plaintiff's treatment record with Dr. Amanullah at the time did not document

dissociative episodes, she continued to drive her car, and she was only diagnosed with dissociation disorder by Dr. Gelbort in March 2019. (R. at 1614).

The ALJ then reviewed objective medical examination findings, which were found to be inconsistent with Plaintiff's self-reports. (R. at 1615). Despite being "aware of the multiple medical opinions . . . that indicate she was not able to sustain gainful employment," the ALJ then discussed how Plaintiff's work duties are "highly inconsistent with her assertions of not being able to work, significant issues with being around others, not doing much work, [and] isolative behavior in the community." (R. at 1615). The ALJ recounted which work and daily living activities Plaintiff performed during the time period at issue. (R. at 1616). This was permissible. *See Crowell*, 72 F.4th at 818; *Olson v. Berryhill*, No. 16-2194, 2018 WL 1341504, at *6 (C.D. Ill. Jan. 31, 2018) ("Although the Seventh Circuit has held that the ALJ should not place undue weight on a claimant's daily activities in assessing his ability to work full-time . . . the [r]egulations specifically instruct the ALJ to consider the plaintiff's daily activities.") (citing 20 C.F.R. § 404.1529(c)(3)(i)). The ALJ did not place undue weight on Plaintiff's activities; the ALJ properly considered them along with the treatment notes and the objective medical record.

The ALJ briefly discussed Plaintiff's travel activity as being inconsistent with her allegations. (R. at 1616). Travel is considered a part of daily activities, and thus, it can be fair game to include. *See, e.g., Ortega v. Berryhill*, No. 17 C 2527, 2018 WL 4144636, at *5 (N.D. Ill. Aug. 30, 2018) ("[I]t was permissible for the ALJ to generally consider how Plaintiff's ability to travel would undermine his credibility."). However,

the Seventh Circuit has disfavored adverse credibility determinations based on the plaintiff's ability to go on a vacation without adequate explanation or questioning by the ALJ. *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014). Consequently, based on the record, which documents only a few details regarding Plaintiff's trip to Costa Rica, the ALJ's reasoning with respect to Plaintiff's family vacation does not support her discounting of her subjective symptoms.

With that said, in the ALJ's analysis of Plaintiff's credibility, the consideration of her travel does not rise to the level of necessitating a remand of the determination. *See, e.g., Dailey v. Colvin*, No. 14-cv-00294, 2015 WL 331859, at *6 (S.D. Ind. Jan. 21, 2015) ("Though the ALJ mischaracterized some of Dailey's activities, the credibility determination was not patently wrong."). The ALJ's credibility determination was "based on the totality of these factors and enough of them withstand scrutiny to support [the] decision." *See Tutwiler v. Kijakazi*, No. 22-cv-2808, 2023 WL 8461648, at *3 (7th Cir. Dec. 7, 2023). To the extent Plaintiff is asking the Court to assign greater weight to her subjective reports of symptoms, this is outside the Court's purview. *See Elder,* 529 F.3d at 413 ("[The court is] not allowed to displace the ALJ's judgment by reconsidering facts or evidence . . . ."). The ALJ's credibility assessment was proper.

## III.    RFC Calculation

Plaintiff argues that the RFC assessment did not account for her limitations in concentration, persistence, and pace. (Doc. 12 at 19). The Commissioner defends the analysis by arguing that the ALJ included limitations that were supported by and

40

consistent with the record and calculated an RFC that properly accounted for those limitations. (Doc. 17 at 11–13).

The RFC is an assessment of what work-related activities the claimant can perform despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The RFC must be assessed based on all the relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1). While the analysis "need not contain a complete written evaluation of every piece of evidence," *Murphy*, 759 F.3d at 817 (citations omitted), "an ALJ's RFC analysis 'must say enough to enable review of whether the ALJ considered the totality of a claimant's limitations,' " *Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir. 2022) (quotations omitted). Additionally, "while an ALJ must consider limitations and restrictions imposed by an individual's impairments, even those that are non-severe, the RFC need only incorporate limitations supported by the claimant's medical record." *Monique B. v. Saul*, No. 19-cv-652, 2020 WL 4208112, at *13 (N.D. Ill. July 22, 2020) (citing 20 C.F.R. § 404.1545(a)(2); *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014)).

Here, as discussed, the ALJ relied primarily on the opinions of the state agency medical professionals to determine Plaintiff's limitations and then to formulate her RFC. (R. at 1622–23). This was permissible. *See Capman v. Colvin*, 617 F.App'x. 575, 577–79 (7th Cir. 2015) (noting the ALJ's reliance on the state agency psychological consultant when assessing claimant's RFC); *Varga v. Colvin,* 794 F.3d 809, 811–14 (7th Cir. 2015) (same). In part, the ALJ determined that Plaintiff has a moderate limitation in maintaining concentration, persistence, and pace. (R. at 1602).

In support of her argument that the ALJ failed to adequately consider Plaintiff's moderate limitation in formulating the RFC, Plaintiff cites outdated authority. (Doc. 12 at 19–22). Her argument, in sum, is that the Seventh Circuit has rejected limitations like those the ALJ suggested. (Doc. 12 at 20). However, more recently, the Seventh Circuit has applied the definition of "moderate" added to the regulations in 2017, meaning "fair" rather than "bad" or "inadequate," and held that "a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace." *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021). Applying *Pavlicek*, courts have held that an RFC that "included the ability to 'understand, carry out, and remember simple, routine and repetitive tasks not at assembly-line type production pace with only occasional, simple work-related decisions' and required that 'changes should occur no more than occasionally and be gradually introduced' " addressed moderate limitations in concentration, persistence and pace. *Hoskins v. Kijakazi*, 21-cv-469, 2022 WL 17665088, at *5 (N.D. Ind. Dec. 14, 2022); s*ee also Morrison v. Saul*, 806 F.App'x. 469, 474 (7th Cir. 2020) ("[L]imiting Morrison to jobs involving 'simple and detailed, one-to-five step instructions only' adequately accounted for the only deficits in concentration, persistence, and pace that the ALJ found supported by the record."); *Pytlewski v. Saul*, 791 F.App'x. 611, 616 (7th Cir. 2019) (finding the ALJ "tailored Pytlewski's workplace setting to accommodate for Pytlewski's anxiety, depression, and anger issues by limiting his interaction with people and restricting him from making high-stakes decisions").

The RFC in this case similarly limits Plaintiff to light work as defined by 20 C.F.R. § 404.1567(b), except that she can only occasionally operate a vehicle, cannot perform production rate or pace work such as assembly-like work, and cannot have direct contact with the public. (R. at 1603). It states Plaintiff can occasionally interact with co-workers and supervisors, and can complete simple, routine, and repetitive tasks along with simple work-related decisions. (R. at 1603). The ALJ reviewed and considered the evidence when determining Plaintiff's mental limitations, and adequately accounted for her moderate limitation in consistence, persistence, and pace. The ALJ's treatment of Plaintiff's limitations is similar to those approved by the Seventh Circuit. *See Weber v. Kijakazi*, No. 20-2990, 2021 WL 3671235, at *5 (7th Cir. Aug. 19, 2021) (writing there is no "categorical rule" that restriction to simple tasks can never adequately accommodate moderate concentration, persistence, and pace limitations). Therefore, Plaintiff fails to show a basis for reversal in the accounting for Plaintiff's limitations in concentration, persistence, and pace.

Plaintiff puts forth additional arguments as to why the RFC analysis was in error. She contends that the ALJ's failure to assess the waxing and waning of her mental health symptoms warrants reversal. (Doc. 12 at 18). Further, she argues that the calculated RFC failed to address potential breaks, absences, and "off-task time," and does not account for Plaintiff's inability to handle stress. (Doc. 12 at 19, Doc. 18 at 2–4). The Commissioner argues that the ALJ properly cited periods of both increased and decreased symptoms and formulated an accurate RFC. (Doc. 17 at 3–4, 11).

43

As previously stated, the ALJ considered only those limitations that were found supported by and consistent with the record evidence. In assessing Plaintiff's work-related limitations, the ALJ cited both periods of increased and decreased symptoms related to Plaintiff's mental and physical health and concluded Plaintiff could still perform full-time work. In doing so, the ALJ found persuasive Drs. Mehr's and Fyans's recommendation that Plaintiff's interaction with the general public be limited. (R. at 1622). Thus, the ALJ limited Plaintiff's interaction with coworkers and supervisors and precluded interaction with the public. (R. at 1603). Plaintiff was also precluded from production rate or pace work in consideration of her mental health symptoms and increased anxiety and stress in her previous skilled job as an insurance agent. (R. at 1622). With these limitations in place, Drs. Mehr and Fyans opined that Plaintiff does not demonstrate an increased need for breaks and can maintain a regular work schedule, a recommendation the ALJ found consistent with and supported by the record. (R. at 1623). Plaintiff's argument that the ALJ failed to address breaks, absences, and "off-task" time is unpersuasive and an impermissible invitation to have this Court "decide the facts anew, reweigh the evidence, [and] substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled." *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).

Plaintiff lastly contends the ALJ failed to ask the VE about Plaintiff's purported need to avoid pregnant women. In making this argument, she relies on *Mandrell v. Kijakazi*, 25 F.4th 514 (7th Cir. 2022). In *Mandrell*, the Seventh Circuit held the ALJ failed to ask the VE relevant questions based on the record, including

hypotheticals on the plaintiff's report that she could not work with men. *Id.* at 518. The court reasoned:

> The vocational expert provided testimony about the pool of jobs that would be available to a person with limitations specified in the ALJ's hypotheticals, but the testimony was only as good as the hypotheticals— and they failed to capture the full picture. None of the ALJ's hypotheticals envisioned a workplace free of men, undoubtedly because it is quite unlikely that excluding men from a workplace is an option, given the employment discrimination laws. Nor did the hypotheticals grapple with some of the medical evidence that Mandrell put in the record and insists should have been considered.

*Id.* The matter at hand is distinguishable from *Mandrell*. The Seventh Circuit faulted the ALJ in *Mandrell* for disregarding numerous medical records and failing to explain how the plaintiff's moderate limitations in concentration, persistence, and pace were accounted for in the RFC, which contributed to error in the hypotheticals posed to the VE. *Id.* at 518–19. Here, the ALJ thoroughly reviewed Plaintiff's submitted medical records, supported her medical opinion analysis with substantial evidence, properly evaluated Plaintiff's subjective symptoms, and explained how a person of Plaintiff's ability can perform at the level described in her RFC. (R. at 1618–23). It is true that the ALJ did not pose a hypothetical to the VE about job opportunities where Plaintiff would not encounter pregnant people. But that is because the ALJ did not find Plaintiff's symptoms related to this social limitation to be consistent with or supported by the record evidence. Thus, the hypotheticals posed to the VE were not based on an inaccurate or missing information, and *Mandrell* is inapplicable to the instant matter.

45

As all of Plaintiff's arguments are found to be without merit, the relief requested in her Brief (doc. 12) is denied. Although this Court is sympathetic to Plaintiff's situation, it must remain mindful of the deference underpinning the substantial-evidence standard and affirm a decision if it is adequately explained and supported. *Elder*, 529 F.3d at 413.

## CONCLUSION

IT IS THEREFORE ORDERED that the relief sought in Plaintiff's Brief (doc. 12) is DENIED, while the relief sought in the Commissioner's Brief (doc. 17) is GRANTED. The decision of the ALJ is AFFIRMED.


SO ORDERED.

Entered this 20th day of December 2023.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge
